## IN RE: FUNDAMENTAL LONG TERM CARE, INC., Debtor.

**Estate of Juanita Jackson, et al., Plaintiffs,**

**v.**

**General Electric Capital Corporation, et al., Defendants.**

Case No. 8:11–bk–22258–MGW
Adv. No. 8:13–ap–00893–MGW

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Signed March 20, 2015.

141. Trustee Ex. 24 & 25.

Gabor Balassa, Esq., Matthew E. Nirider, Esq., Kirkland & Ellis LLP, Jeffrey W. Warren, Esq., Bush Ross, P.A., Counsel for GTCR Associates, VI; GTCR Fund VI, LP; GTCR Golder Rauner, LLC; GTCR Partners VI, LP; GTCR VI Executive Fund, LP; Edgar D. Jannotta, Jr.; THI Holdings, LLC

Steven M. Berman, Esq., Seth P. Traub, Esq., Shumaker, Loop & Kendrick, LLP, Counsel for the Chapter 7 Trustee

James Wilkes, Esq., Isaac R. Ruiz-Carus, Esq., Bennie Lazzara, Jr., Esq., Wilkes & McHugh PA, Harley E. Riedel, Esq., Daniel R. Fogarty, Esq., Stichter Riedel Blain & Prosser, P.A., Counsel for the Estates of Juanita Jackson, Elvira Nunziata, Joseph Webb, Opal Lee Sasser, Arlene Townsend, and Francina Spivery–Jones

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Michael G. Williamson, United States Bankruptcy Judge

In 2006, Edgar Jannotta, as a director of Trans Healthcare, Inc. ("THI") approved the sale of Trans Health Management, Inc. ("THMI"), THI's subsidiary at the time, to the Debtor for $100,000. At the same time, THI's parent company, THI Holdings, sold THI's sister company, THI of Baltimore, Inc. ("THI–Baltimore) for approximately $10 million. Six probate estates, who were tort creditors of THI and THMI, and the Chapter 7 Trustee in this case allege that Jannotta breached his fiduciary duty by selling THMI for less than it was worth and allowing THI–Baltimore's buyer to divest THMI of its assets and that THI Holdings and the GTCR Group (which owned THI Holdings) aided and abetted that breach.[1]

After hearing nearly 100 hours of testimony, and considering over 3,000 exhibits, the Court concludes Jannotta did not breach his fiduciary duty to THI's creditors and, as a consequence, THI Holdings and GTCR could not have aided and abetted a breach. The Plaintiffs failed to offer any evidence that THMI was worth more than $100,000. In fact, the evidence at trial was to the contrary. And there is no evidence Jannotta had any way of knowing THMI would be divested of its assets. In fact, the evidence overwhelmingly demonstrates Jannotta approved a transaction that was in the best interest of all of THI's creditors (secured and unsecured) and preserved THMI's assets for the benefit of its tort creditors. For all those reasons, the Court will enter final judgment in favor of Jannotta, THI Holdings, and GTCR.

### Findings of Fact

#### THI Is Founded

Founded in 1998, THI operated nursing homes, assisted living facilities, and long-term acute care hospitals through various operating subsidiaries. THMI, a wholly owned subsidiary of THI until March 2006, provided management services to THI's

---

1. Actually, the Probate Estates and Trustee named 16 defendants. One defendant—Rubin Schron—prevailed at the dismissal stage. Three more defendants—General Electric Capital Corporation, Ventas Realty Limited Partnership, and Ventas, Inc.—prevailed on summary judgment. The Court tentatively ruled that the remaining five defendants—Leonard Grunstein; Murray Forman; Fundamental Administrative Services, LLC; Fundamental Long Term Care Holdings, LLC; and THI of Baltimore, Inc.—may be liable under a successor liability theory. That claim, however, was resolved in a post-trial mediation and is not the subject of these Findings of Fact and Conclusions of Law. So this Court is only dealing with the remaining claims against Jannotta, THI Holdings, and GTCR.

operating subsidiaries. From the early days of THI's existence, GTCR made substantial investments in THI to finance nursing home acquisitions.[2] By 2002, GTCR had acquired an approximate 80% equity interest in THI.[3] As a result, from 1998 to 2003, THI had acquired 73 nursing home facilities. These facilities were owned by THI subsidiaries.[4]

### IHS Acquisition

In 2002, THI, through a new parent, THI Holdings, LLC ("THI Holdings"), decided to expand its operations by acquiring more than 120 nursing homes owned by Integrated Health Services, Inc. ("IHS"), which was proposing to sell its nursing home assets as part of a Chapter 11 case pending in Delaware.[5] As with all bankruptcy sales, however, there was competitive bidding, and THI Holdings was outbid by a company called ABE Briarwood.[6] Murray Forman and Leonard Grunstein were Briarwood's advisers in the IHS acquisition.[7]

Apparently, litigation ensued about the bid results. Forman, Grunstein, and Briarwood had no experience operating nursing homes.[8] As a result, a settlement was reached between THI Holdings and Briarwood under which a new THI Holdings subsidiary, THI of Baltimore, Inc. ("THI–Baltimore") and its affiliate, THI Nevada, would lease the 120 IHS facilities from Briarwood and operate them.[9]

Certain control provisions in these leases had a significant impact on the ultimate course of events that led to this lawsuit. For starters, the leases not only provided that THI–Baltimore and its subsidiaries would not have any ownership rights in the facilities,[10] but they also provided that THI–Baltimore could not "sell, assign, sublease, or otherwise transfer" the leases to anyone without Briarwood's consent. Even more onerous, Briarwood had the right to withhold consent—even "unreasonably"—to the assignment of more than 49% of the leases.[11]

---

2. Trial Tr. vol. 092614, 18:10–13, 21:15–18, Sept. 26, 2014; Defs.' Ex. 0021 at 1; Defs.' Ex. 0024.

3. Trial Tr. vol. 092614, 17:23–25; Defs.' Ex. 0533.0001 at THI Holdings–TOWNSEND_0001516 (showing GTCR Fund VI with an 82.0315 percent ownership in Holdings); Defs.' Ex. 0551.0001 at THI Holdings–TOWNSEND_0001537 (showing GTCR Fund VI with 82.0315 percent ownership in Holdings).

4. Trial Tr. vol. 092614, 26:16–18; Trial Tr. vol. 092914, 73:8–17, Sept. 29, 2014 (stating that there were THMI contracts with THI in about seven Ventas homes); Defs.' Ex. 0352 at GECC0213852 (Schedule 1) (listing seven leased facilities).

5. Trial Tr. vol. 092614, 21:25–22:2 (stating that Holdings was formed in early 2003 "for the purpose of pursuing the acquisition of the IHS facilities out of bankruptcy").

6. Trial Tr. vol. 092614, 22:13–16; Defs.' Ex. 1507 at 13 (stating purchase price).

7. Trial Tr. vol. 092314, 113:21–114:4, Sept. 23, 2014; Trial Tr. vol. 092614, 24:4–6; Trial Tr. vol. 100114, 22:19–25, Oct. 1, 2014; Bennett Dep.74:1–6, 86:22–24,.Feb. 12, 2014.

8. Trial Tr. vol. 100114, 22:6–11 (stating that ABE Briarwood did not contemplate being an operator of skilled nursing homes because it "strictly was engineering a financial transaction"); Trial Tr. vol. 092614, 23:8–16 (stating that the Briarwood people were real-estate-driven investors and so their interest in the homes was largely as a real estate investment).

9. Defs.' Ex. 0508 at KE_0001528; Defs.' Ex. 0509 at § 8 at GTCR–00048432.

10. Defs.' Ex. 0508 at § 3(d) at KE_0001536; Trial Tr. vol. 093014, 98:19–99:18, Sept. 30, 2014 (stating that the ABE Briarwood "leases are not equivalent to an ownership interest").

11. Defs.' Ex. 0508 at § 9.1 at KE_0001611; Trial Tr. vol. 092614, 94:24–95:4; Trial Tr. vol. 093014, 77:20–22, 79:15–17.

By year-end 2003, THI Holdings had 120 leased facilities operated by THI–Baltimore and THI Nevada (THI–Baltimore had 116 and THI Nevada had four) and another 73 facilities owned and operated by THI.[12]

### THMI's Role

The entity that actually provided the management services to the various THI and THI–Baltimore nursing home subsidiaries was THMI.[13] It was created in April 2002 as part of the IHS transaction and provided services such as accounting, payroll, accounts payable, collections, and information technology.[14] There were also management services provided by THMI to Lyric Health Care, LLC ("Lyric") and Claremont Health Care, LLC ("Claremont").[15] THMI, along with THI, THI Holdings, and other entities, operated out of the same offices formerly occupied by IHS in Sparks, Maryland.[16]

### Improper Accruals Discovered

After the acquisition of the IHS facilities in September 2003, the IHS top management team was brought over to THI. They quickly identified improper accruals in THI's unaudited financial statements for year-end 2003.[17] Ultimately, there were substantial adjustments that needed to be made to the 2003 THI financial statements with the effect that previously positive net income became a net loss of more than $26 million.[18]

### Defaults and Forbearance Agreements

The discovery of improper accruals was the triggering event of a series of defaults, forbearance agreements, and financial problems that led to the 2006 sale. During this period of time up to March 28, 2006, THI, THI Holdings, and THMI's boards were comprised of Edgar Jannotta, Thomas Erickson, and W. Bradley Bennett.[19]

Following the adjustment, defaults were called on the loans held by General Electric Capital Corporation ("GECC") and Ventas, Inc. ("Ventas").[20] Subsequently, another lender, CapitalSource, issued a notice of default.[21] A forbearance agreement was entered into to give THI an opportunity to find a long-term solution to its financial problems. From August 2004 until March 28, 2006, THI entered into 15 additional forbearance agreements.[22] To make matters worse, the third-party management agreements with Lyric were terminated effective October 1, 2004, causing additional financial problems.[23]

12. Defs.' Ex. 0024; Defs.' Ex. 0512 at RECEIVER_COLLECTION_0000339; Trial Tr. vol. 092614, 26:24–27:1, 27:14–18, 27:21–23, 34:7–14.

13. Trial Tr. vol. 092614, 26:5–11, 28:3–7; Box Dep. 280:16–21, Mar. 18, 2014; Defs.' Ex. 1501.

14. Trial Tr. vol. 092614, 28:8–12; Box Dep. 280:22–281:10, Mar. 18, 2014.

15. Trial Tr. vol. 092614, 29:5–16, 29:17–20.

16. Pls.' Ex. 517, 519.

17. Trial Tr. vol. 092614, 35:8–10.

18. Defs.' Ex. 0519 at 44 (showing effect of 2003 audit adjustment); Trial Tr. vol. 092614, 36:18–22.

19. Defs.' Ex. 0205 at PPROD_0005289–90; Defs.' Ex. 0206 at 3, 5; Defs.' Ex. 0207 at RECEIVER_COLLECTION_0001123–25.

20. Trial Tr. vol. 092614, 41:15–17, 45:9–15.

21. Pls.' Ex. 0221 at § I at NORD 00012470 (noting that "events of default have occurred and are continuing under" the Capital Source loans).

22. Defs.' Ex. 0355–0370; Defs.' Ex. 0374–0389; Pls.' Ex. 0587.

23. Defs.' Ex. 1538 at 2, 3; Defs.' Ex. 1519 at THI00125 (amending agreement to remove, among others, Gainesville Healthcare Center, Inc. and Pinellas Park Nursing Home, Inc.).

*Threats of Lease Termination*

Further contributing to THI's financial woes were threats of default by Murray Forman regarding the leases of the THI–Baltimore facilities acquired in the IHS transaction. Viewed in hindsight, it appears to the Court that, at some point, Forman was engaged in a very high-level financial chess game in which he structured the leases so that the IHS nursing homes could not be sold to anyone other than an entity that he and Grunstein controlled. This meant that if they could take back the leased IHS facilities together with the management team, then he would have what he had wanted back at the time of the IHS deal—not only ownership of the nursing homes, but also a management team in place that could run them. And that is exactly what happened.

It started with various threats of default and termination of the leases.[24] These threats continued through 2005, starting with a meeting in January 2005, ostensibly to discuss allegations of default. But as matters turned out, the other purpose of the meeting was to discuss, by way of a resolution of those defaults, the acquisition by Forman and Grunstein of the former IHS facilities.[25] As stated by Jannotta, "you've got a landlord that has made it expressly clear that they want to buy the business. That same landlord has the right to block the sale of that business to any third parties. There was no point in trying to go to a third party."[26] So, unquestionably, the threat of default was a form of leverage used to reacquire the IHS facilities.

From Jannotta's perspective, Forman and Grunstein were "very difficult people to work with and contentious, in terms of how they approached business."[27] He characterized them as "a bit unsavory."[28] In a similar vein, he applied to them the old adage, "if you lie down with dogs, you get fleas."[29] As it turned out, Jannotta's perception turned out to be prophetic.

*THMI Always Part of the Deal*

There was never any question that Forman not only intended to acquire the IHS facilities, but also intended to acquire the management function being performed by THMI. In fact, a January 2006 GTCR investment committee memorandum stated that "Fundamental has required as a condition to its purchase of Baltimore that (i) it also acquire Management, Inc. [referring to THMI], the entity that employs the executive group team that now runs Holdings and its subsidiaries, and (ii) the bulk of that executive group, including Holdings CEO Brad Bennett, manage Baltimore following its sale."[30]

As explained by Matthew Box, former CFO of THI Holdings, without the participation of THMI's executive management and employees under Fundamental Long

---

24. Defs.' Ex. 0007 at GTCR–0001491; Defs.' Ex. 0532 at 2 (referring to "[a] possible termination letter" to be sent to Jannotta "in connection with THI satisfying certain provisions under the Lease"); Defs.' Ex. 0213 at 10, 71 (referring to "risk" arising from "Monetary/Non-monetary defaults"), 76 (summarizing ABE Briarwood's "assertions of default"); Trial Tr. vol. 092914, 240:9–14, Sept. 29, 2014.

25. Trial Tr. vol. 092614, 87:21–88:7, 88:9–21; Trial Tr. vol. 100114, 33:20–34:4; Defs.' Ex. 0540.

26. Trial Tr. vol. 092614, 132:16–20.

27. Trial Tr. vol. 092914, 82:4–6.

28. Trial Tr. vol. 092914, 81:17–18.

29. Trial Tr. vol. 092914, 83:17–19; Pls.' Ex. 966.

30. Defs.' Ex. 0001 at GTCR 0001527.

Term Care Holdings, LLC's ("FLTCH") ownership of THI–Baltimore and its affiliates, Forman would not have been able to operate the THI–Baltimore facilities after the closing date. In this regard, he stated:

> I think in, again, in a consolidated transaction where Murray Forman was buying THI of Baltimore, he needed the services of the people who are under Trans Health Management, Inc. in order to support his, those properties under THI of Baltimore.
>
> We, on the other hand, didn't need those level of services or that number of people. So it was the obvious transaction that needed to happen, if you were going to get THI of Baltimore, the corporate infrastructure to support that had to somehow be conveyed to them.[31]

While it was unquestionably Forman's idea to acquire THMI along with THI–Baltimore, it was in THI's interest to sell THMI as part of the THI–Baltimore transaction. It made no financial sense from the THI side of the transaction for THMI, with its cost structure and range of services, to continue to provide those services solely to the THI nursing homes after the sale of THI–Baltimore. Obviously, THMI, which was in the business of managing 190 nursing homes, had a cost structure that could not be sustained by continuing as a THI entity and managing the remaining 73 nursing homes. In all, around 80% of THMI's business was from THI–Baltimore facilities. Without THI–Baltimore, THMI would "create substantial financial problems for THI" by burdening it with significant overhead while generating only a small fraction of past revenues.[32] So Bennett's August 1, 2005, sale proposal to Forman recognized this in stating that "ABE would assume all employee obligations" of THMI. This letter also recognized that THMI's services would still be needed by THI. Specifically, it stated that THI "would have the option to enter into a management agreement with ABE under which the THM employees would manage THI's subsidiaries."[33]

### Agreement in Principle

An agreement in principle was reached in the fall of 2005 for a Foreman–and–Grunstein–related entity to buy THI–Baltimore and THMI for $8 million cash and a $2 million note.[34] The October 12, 2005, draft Stock Purchase Agreement showed "ABE Briarwood Corp." as the purchaser of THI–Baltimore.[35] It does not mention THMI.

A November 16, 2005, draft reflects a sale of THI–Baltimore to FLTCH. It also reflects a sale of THMI to an unnamed presumably to-be-formed entity, which is defined in the agreement as "Management."[36] This is similar to the corporate structure utilized by the THI nursing homes under which the management function was housed in a separate corporation devoted exclusively to providing management services to the numerous nursing home affiliates.

There was a $10 million combined purchase price for the acquisition of THI–Baltimore and THMI.[37] To arrive at this price, THI Holdings analyzed the value of

---

31. Box Dep. 224:1–11, Mar. 17, 2014.

32. Trial Tr. vol. 092614, 124:20–125:3.

33. Defs.' Ex. 0240 at GTCR–0003968.

34. Trial Tr. vol. 092614, 121:4–16; Trial Tr. vol. 100114, 40:8–17.

35. Defs.' Ex. 0544 at TS005271.

36. Trial Tr. vol. 100114, 84:19—85:9; Defs.' Ex. 0544 at TS005271.

37. Trial Tr. vol. 092614, 121:12–13.

THI–Baltimore's future cash flows.[38] THI Holdings' management and its board assigned THI–Baltimore no "terminal value" given that THI–Baltimore/THI Nevada did not own the facilities and given the contractual limitations on the ability to sell the THI–Baltimore/THI Nevada facilities and the threatened lease defaults.[39] And THI assessed that THMI had *de minimis* value.

### Forman Splits the Transaction

Forman later instructed his attorneys, Troutman Sanders LLP, to split the transaction into two separate sale contracts.[40] The sale of THI–Baltimore and the affiliated nursing homes remained the same, with FLTCH set up to become the acquiring entity. However, the sale of THMI was split out into a separate contract under which a newly formed entity having a remarkably similar name and thus appearing to be an affiliate of FLTCH, Fundamental Long Term Care, Inc. ("FLTCI"), would become the owner of THMI.[41] A December 30, 2005, application for FLTCI's Employee Identification Number ("EIN") identified Forman as the "[p]rincipal officer, general partner, grantor, owner, or trustor" and Grunstein as the "[e]xecutor, trustee, 'care of' name" and used Troutman's address for FLTCI.[42]

Forman also selected the registered agent for FLTCI.[43] Documents filed with FLTCI's registered agent for service of process in Delaware designated Forman to receive renewal invoices care of MetCap Holdings.[44] Other draft documents related to FLTCI's formation, authorization, and execution of the THMI transaction named Forman, Grunstein, or both as the directors and notice agents for FLTCI as late as February 28, 2006.

It appears that while Forman was putting in place an ultimate ownership structure that would segregate THMI and its liabilities from the nursing homes being acquired, from THI and GTCR's perspective, the sale continued to be viewed as placing ownership with an affiliate of Abe Briarwood. In fact, a January 2006 GTCR investment committee memorandum stated "[t]he sale of Holdings subsidiary THI–Baltimore, Inc .... and Trans Health Management, Inc .... to ABE Briarwood-affiliate Fundamental Long–Term Care Holdings, LLC ... for $10 million." [45]

### Jannotta Perceives Abe Briarwood as the Purchaser

Jannotta understood that Abe Briarwood was an entity "known to have some substantial resources, having purchased both the IHS facilities" and "the Mariner homes in a separate transaction for a billion dollars in the previous 24 months." [46] Viewed from this perspective, THMI's

**38.** Trial Tr. vol. 092614, 123:21–25; Jannotta Dep. 356:15–21, Feb. 27, 2014.

**39.** Jannotta Dep. 356:21–357:13; Trial Tr. vol. 092614, 124:1–9; Trial Tr. vol. 093014, 10:1–9; Defs.' Ex. 0508 at § 3(d) at KE_0001536.

**40.** Trial Tr. vol. 092214, 274:21–275:4, Sept. 22, 2014; Trial Tr. vol. 092614, 138:13–25; Defs.' Ex. 0568; Defs.' Ex. 0569.0001.

**41.** Trial Tr. vol. 092214, 275:15–23; Baker Dep. 128:22–129:1, Mar. 6, 2014; Pls.' Ex. 0403 at TS003347 (designating the buyer of THMI as FLTCI); *see also* Defs.' Ex. 0568 at KE_0000478 (identifying FLTCH as "the Buyer"); Defs.' Ex. 0569.0001 at KE_0000969 (identifying FLTCI as "the Buyer").

**42.** Pls.' Ex. 415.

**43.** Trial Tr. vol. 092214, 275:24–276:5.

**44.** Pls.' Ex. 404 at P404–000002.

**45.** Defs.' Ex. 0009 at GTCR–0001526, GTCR–0001538.

**46.** Trial Tr. vol. 092614, 193:16–20; Trial Tr. vol. 100114, 24:3–7, 24:19–23.

stock was being sold by a company in financial distress to the Fundamental group, which appeared to be affiliated with Briarwood that had "substantial resources" to support THI–Baltimore and THMI.[47]

From Jannotta's perspective, the actual structure of the transaction was relatively straightforward. The THI–Baltimore nursing homes, together with the management company, THMI, were being sold in stock sales. As such, the assets and liabilities would travel with the corporations with the only change being that they would no longer be owned by THI and THI Holdings but instead would be owned by an Abe Briarwood-related entity: either Fundamental Long Term Care Holdings, LLC, or an apparent affiliate with a similar name, Fundamental Long Term Care, Inc.

Based on the available projections, it was expected that THI would continue as a going concern after the restructuring, with improved financial performance, including revenue and earnings growth, from 2005 to 2010.[48] And the hope, ultimately, was that all of the creditors would be paid and that, after, GTCR would receive a positive return for the investment that was necessary to accomplish the restructuring of THI.[49]

### THMI's Indemnification for PL/GL Lawsuits

While THMI would remain liable for any lawsuits pending against it at the time of the closing, further assurance of ultimate payment of any liabilities regarding these lawsuits was built into the transaction in an indemnification agreement. Specifically, the THMI Stock Purchase Agreement contained an indemnification provision under which THI retained defense counsel to represent THMI in various professional liability lawsuits.

While the indemnification provision in the THMI Stock Purchase Agreement did not obligate THI to defend THMI in Lyric-related lawsuits,[50] because THI was also a defendant in these lawsuits, it retained legal counsel to defend THMI.[51] The only lawsuits that were not resolved by THI or THI–Baltimore before THI filed for receivership in 2009 were the six lawsuits brought by the probate estates comprising the creditors in this case.[52]

### Jannotta and the Board Properly Fulfill Their Fiduciary Obligations

The Plaintiffs in this case allege that Jannotta and the boards on which he sat breached their fiduciary duties owed to the creditors of THI and THMI. Relevant to this allegation was substantial evidence that there were numerous meetings of THI's board after the defaults were declared and leading up to the March 2006 sale. Jannotta, a board member, took the lead role in addressing the financial challenges that THI faced. In addition to

---

47. Trial Tr. vol. 092614, 193:21–194:3.

48. Trial Tr. vol. 092614, 140:25–141:5; Defs.' Ex. 0009 at GTCR–0001530.

49. Trial Tr. vol. 092614, 143:10–22; *see also* Defs.' Ex. 0009 at GTCR–0001532, GTCR–0001532–33 (presenting analysis of possible return to GTCR Funds on investment in restructuring).

50. Defs.' Ex. 0569.0001 at § 6(c)(iii) at KE_0000977; *see also* Grochal Dep. 96:25–

97:7, Jan. 13, 2014 (stating that it is "readily apparent" that there was no contractual duty set forth in the Stock Purchase Agreement).

51. Trial Tr. vol. 092314, 305:16–25, Sept. 23, 2014; Trial Tr. vol. 093014, 18:18–19:3, 20:15–23; *see also* Anderson Dep. 286:19–22, Feb. 20, 2014 (testifying that "THI was providing a defense to THMI for those Lyric PL–GL cases"); Defs.' Ex. 0027; Defs.' Ex. 0071.

52. Defs.' Ex. 0027; Scharrer Dep. 66:5–15, Apr. 14, 2014.

formal board meetings, there were numerous informal phone calls to discuss the evolving situation.

As of July 2004, THI's board correctly concluded that there were only two realistic alternatives to addressing the THI financial problems: a Chapter 11 or a restructuring with additional capital infusion. At trial, Jannotta testified credibly that he fully understood the nature of the duty to creditors owed by members of the board. In his words, he understood that he had a duty "to look out for the company's creditors. Simple as that. And it was a theme throughout the meetings, throughout this entire period of distress."[53]

#### The Creditor Body at the Time of the March 2006 Sale

At this point, it is important to consider who THI's creditors were between 2004 and 2006. At that time, there were several major creditors whose liens were secured by all the assets of the various THI entities. There were also the typical day-to-day creditors usually reflected in accounts payable. In addition, there were ongoing commercial lawsuits. And, of course, given the nature of the nursing home business, there were approximately 130 asserted but unliquidated and disputed claims for personal injury and wrongful death.

It is these latter claims that are the focus of the Court's attention. But viewed from the perspective of what was occurring in the period leading up to the March 2006 sale, these personal injury and wrongful death claims at that point were disputed and/or unliquidated. It was always envisioned that they would be dealt with as continuing liabilities of the companies that had been sued, typically THI and/or THMI, and whatever entity operated the particular nursing home.

And, importantly, it was the belief of management and the board that the overall liability for these claims would be in the range of $1 million, a relatively small number in the context of the debts owed to creditors with undisputed claims. For example, as of a March 9, 2006, email from a senior attorney at THI explaining the status of current Lyric claims, there were 12 claims with an estimated value of $70,000 per lawsuit.[54] And a May 31, 2006, Litigation Update assigning values to all claims against THI and THMI related to Lyric facilities reflected $805,000 for all claims and $550,000, in the aggregate, for the claims held by the Webb, Sasser, and Nunziata Estates.[55]

And, as discussed above, not only would the personal injury claims continue as liabilities of THMI, but also, under the Stock Purchase Agreement, THI and THI Holdings agreed to indemnify THMI against any losses associated with THMI's management of THI and THI–Baltimore's operating subsidiaries.[56]

#### The Bankruptcy Alternative

Much has been made of the alternative of a bankruptcy filing as being potentially better for creditors than the 2006 restructuring. The evidence does not support that view. To the contrary, an analysis conducted at the time, which the Court views as realistic and similar to many analyses and outcomes this Court has personally experienced in cases, reflected that secured creditors of THI and its subsidiar-

---

53. Trial Tr. vol. 092614, 146:19–147:1.

54. Defs.' Ex. 0576.0020.

55. Anderson Dep. 285:12–19, Feb. 20, 2014; Defs.' Ex. 0071.

56. Defs.' Ex. 0569.0001 at § 6(c)(iii) at KE_0000977–78; Trial Tr. vol. 092614, 191:18–25; Anderson Dep. 794:20–795:3, May 14, 2014.

ies would lose at least 28 cents on the dollar, and potentially far more, in a bankruptcy proceeding. Unsecured creditors, on the other hand, would recover just one to two cents on the dollar.

As a result, the board concluded that a bankruptcy filing was the worst of the two available options in terms of potential recovery for creditors. As GTCR's restructuring expert and co-head of AlixPartners' Restructuring Practice, James Mesterharm, explained, "the restructuring provide[d] a much more certain path for THI to emerge from this process as a viable business with a chance to succeed." [57] THI's ability to acquire debtor-in-possession ("DIP") financing and to develop a confirmable plan were both uncertain, and a Chapter 11 filing likely would have impaired THI's business and consumed more of THI's resources than the March 2006 out-of-court restructuring.

This Court agrees. This Court has presided over innumerable cases where companies with similar problems filed for Chapter 11, resulting in a relatively quick auction sale of the assets, hopefully as a going concern. Inevitably, in these cases, there is at most a modest carve-out for unsecured creditors, which is usually enough to cover administrative expenses and pay pennies on the dollar to the unsecured creditors. The only creditors that get paid are the secured creditors, and in most cases, even they take a substantial haircut in the process.[58]

### Restructuring Only Viable Approach

So that left a restructuring as a far better alternative to the various classes of creditors, including potential future liabili-

ty for wrongful death or personal injury claims. On the other hand, a restructuring also had substantial drawbacks to GTCR. On the front end, all of the money not covered by the sale proceeds that would need to be raised to fund a restructuring, including payments of numerous undisputed and liquidated claims, pay down on the secured debt, and providing capital for the company, would have to come from GTCR. On the backend, there was no guarantee that GTCR would ever receive any return on this investment. And worse, the adverse relationship that THI had with the landlord on its leased facilities reduced the field of prospective purchasers to one: Briarwood.

### Barry Saacks' Involvement

Up until four days before signing the THMI Stock Purchase Agreement and two months after the formation of FLTCI, Troutman still did not know who would own FLTCI or who would be the officers and directors of THMI. Forman and his partner, Grunstein, certainly did not want to become owners of THMI.[59] In Forman's words, THMI was "somewhat of an orphan company in the transaction." [60] Apparently, Grunstein had been involved with similar circumstances before in which he had identified an individual by the name of Barry Saacks who had acquired an orphan company. Grunstein thought that Saacks was perfect for that role in this transaction as well.[61]

The Troutman attorney handling the document preparation in the transaction learned that Saacks would be the sole owner of FLTCI by February 27, 2006, the day before signing. However, she still

**57.** Trial Tr. vol. 093014, 188:14–16.

**58.** Defs.' Ex. 0007 at GTCR–0001491; Defs.' Ex. 0008 at GTCR–0001502 (describing "main constituents to a restructuring").

**59.** Trial Tr. vol. 100114, 54:22–55:2.

**60.** Trial Tr. vol. 100114, 55:3–4.

**61.** Trial Tr. vol. 100114, 54:22–55:12.

needed clarification from Forman regarding the identity of the directors and officers of FLTCI. In an email dated February 27, 2006, she confirmed with Forman, "I understand Barry Saacks will be the 100% owner of Fundamental Long Term Care Inc." [62]

Brett Baker, the senior associate at Troutman working on the transaction, testified that, as with all decisions surrounding the transaction, Forman decided and instructed Troutman to name Saacks as the sole director of FLTCI.[63] Later, on the afternoon of February 27, 2006, the attorney changed the Statement of Organization of FLTCI (which had already been signed by the sole incorporator, another Troutman attorney, three days before) to remove whatever directors were previously named and to make Saacks the sole director of FLTCI.[64] It appears that none of the attorneys at Troutman ever conferred with Saacks about these changes but instead took their direction from Forman.[65]

On two occasions, Saacks was paid to come to Troutman's offices to sign documents. Baker asked the firm's junior associates to meet with Saacks to get his signature on the documents.[66] One of the associates described Saacks as having a "disheveled" appearance and "hygiene issues." [67] Baker was so concerned about the unusual circumstances surrounding Saacks' involvement that he memorialized the interactions among Saacks, Grunstein, and other Troutman attorneys who attended these signing meetings in an email.[68] In the email, he relays a description given to him by a junior associate of Saacks as "an ultra [O]rthodox religious Jew who lived in a basement in Brooklyn and had hygiene issues." [69] He goes on to state that he was "very uncomfortable with Barry being paid money by Len [Grunstein] to sign documents he did not read nor understand. . . . I raised these issues with Steve Lewis who just laughed about it. In fact, Steve wanted to know how bad Barry looked. I think I might have spoken to Richard Rubin about this as well. I believe Richard didn't think it was right and just shook his head." [70]

After the bankruptcy case was filed, Saacks testified that he had never been a shareholder, director, or officer of FLTCI.[71] He also testified that he had never heard of THMI.[72] While Saacks recalled being presented with an opportunity by Grunstein to acquire some computers from "Fundamental"—not THMI—from his perspective, nothing came of it.[73] Even more telling was Saacks' description of the Fundamental business deal as "nonsense" [74] and as "just a ghost. . . . It's just kind of an illusion. . . . It's not solid." [75]

Saacks testified that he was never involved with THMI and never bought any

**62.** Pls.' Ex. 496 at P496–000001.

**63.** Baker Dep. 135:24–136:18, 239:1–243:16, 246:3–248:2.

**64.** Pls.' Ex. 497.

**65.** Baker Dep. 246:18–21.

**66.** Baker Dep. 192:2–193:21.

**67.** Baker Dep. 197:19–20.

**68.** Pls.' Ex. 946.

**69.** Pls.' Ex. 945 at P945–000001.

**70.** Pls.' Ex. 945 at P945–000001.

**71.** Saacks Dep. 52:20–53:7, Feb. 24, 2014.

**72.** Saacks Dep. 44:14–45:9.

**73.** Saacks Dep. 20:23–21:12.

**74.** Saacks Dep. 23:15–17.

**75.** Saacks Dep. 69:24–70:4.

computers belonging to THMI.[76] According to Saacks, he was not aware of the THMI transaction ever really occurring, stating specifically:

> I can't tell you [what transpired with FLTCI] because nothing has transpired. All that transpired was somebody lit a match and brought some light into the room, and then eventually the match went out as an example. . . . I can't offer anything of any use because I don't even know if—for those six years, nobody told me you bought it, nobody told me . . . . [77]

### Jannotta Unaware of Forman's Chicanery

Because a formal closing never took place, Jannotta did not witness the highly suspect circumstances attendant to the signing of the documents by Barry Saacks.[78] It was also undisputed that Jannotta had never met or heard of Saacks before the March 2006 sale.[79] At trial, Jannotta testified credibly that he felt that he was duped in the 2006 sale and that he was stunned when he saw the video deposition of Barry Saacks.[80] According to Jannotta: "[O]bviously what was going on, on the other side of the transaction, was wholly different than our understanding." [81]

THI had been dealing with Fundamental's lawyers and its "deal guy," Forman, not with other members of the Fundamen-

tal team, and Jannotta had no reason to doubt that Saacks was FLTCI's president, as set forth in the signature page prepared by Forman's attorneys at Troutman Sanders.[82] There was also no evidence that Forman or his attorneys, who negotiated the THMI Stock Purchase Agreement, or anyone else, disclosed to the sellers that Saacks was FLTCI's sole shareholder.

### Restructuring Costly to GTCR

If anything, an argument could be made by other GTCR investors that Jannotta continued to throw GTCR's good money after bad by providing the funding to sustain a failing business venture. After all, the cost to GTCR of the restructuring continued to climb throughout the process. By January 2006, "the equity investment necessary to complete this recapitalization" had grown from $10 million to "approximately $13 million . . . [and] could potentially be as high as $16 million at closing." [83] And every increase in settlement costs or trade payables translated into "dollar-for-dollar" increases in the investments needed from the GTCR Funds.[84] By February, the number had jumped to the $17 million-$18 million range.[85]

By the date of the restructuring transaction, $20 million of new capital was required to fund the restructuring. In addition, the GTCR Funds contributed $1.5 million toward the restructuring in Janu-

---

**76.** Saacks Dep. 44:10–45:9.

**77.** Pls.' Ex. 1121 at 22:25–23:11.

**78.** Trial Tr. vol. 092214, 275:5–14 (stating that the closing of the sale of THI Baltimore, THI Nevada, and THM was a virtual closing); Box Dep. 96:8–11, Mar. 17, 2014.

**79.** Trial Tr. vol. 092614, 164:17–20.

**80.** Trial Tr. vol. 092614, 165:17–166:18.

**81.** Trial Tr. vol. 092614, 166:18–20.

**82.** Trial Tr. vol. 092614, 164:25–165:12; Box Dep. 233:23–234:4, Mar. 17, 2014.

**83.** Trial Tr. vol. 092614, 134:23–135:2; Defs.' Ex. 0009 at GTCR–0001526.

**84.** Trial Tr. vol. 092614, 136:14–23.

**85.** Defs.' Ex. 0010 at GTCR–0001540.

ary and February 2006.[86] On March 28, 2006, the GTCR Funds also forgave outstanding loans to THI, which totaled more than $13 million of principal and interest.[87] None of the GTCR entities received any distributions or disbursements as part of the restructuring.[88]

From the sale proceeds, THI Holdings used a portion to pay current obligations, tax obligations, and restructuring-related expenses. The balance of the sale proceeds, totaling $8.78 million, went to THI.[89] In summary, as of the closing of the March 2006 restructuring, the GTCR Funds and Holdings contributed $28.8 million in cash to THI, plus more than $13 million of principal and interest on the loans that the GTCR Funds forgave. Thus, roughly 70% of the cash that THI received in the restructuring was from the GTCR Funds and Holdings.[90]

In fact, viewed from the perspective of hindsight, GTCR's investment in this nursing home enterprise from 1998 until the receivership was filed in 2009 was a financial disaster. GTCR not only made no profit, but the GTCR Funds also lost more than $60 million. In Jannotta's words, it "was a complete loss." [91]

*The Bonuses*

Much has been said about the bonuses paid to corporate executives as part of the restructuring. But these were bonuses for work performed in 2004 and 2005 that had been withheld because of the financial problems. Most importantly, every penny of these bonuses came out of GTCR's pockets, not the pockets of other creditors. The unpaid bonuses represented obligations owed at the time of the restructuring. Frankly, in this Court's experience, what are often called retention bonuses are common in restructurings in Chapter 11 cases of large entities because of concern that key people will leave at a critical time when they are most needed. In this case, no bonus payments were made to Jannotta or to any GTCR entity or employee.[92]

*Value of THMI and THI–Baltimore/Nevada at Time of Closing*

At trial, the Plaintiffs called to testify three well-qualified experts: Soneet Kapila, James Feltman, and Thomas Vasquez, Ph.D. However, all declined to offer any opinion as to THMI's assets, THMI's workforce, or the value of THMI as a going concern. The reason for these experts not giving opinions of value

**86.** Trial Tr. vol. 092614, 167:9–14; Defs.' Ex. 0588 at GECC0313736 (describing $20 million investment of GTCR Funds into THI as part of restructuring); Defs.' Ex. 0555 (describing payment by GTCR Funds of $500,000 in connection with Aegis settlement); Defs.' Ex. 0570 (describing payment by GTCR Funds of $1,000,000 in connection with Aegis settlement).

**87.** Trial Tr. vol. 092614, 168:19–20 (stating that GTCR Funds also contributed "$13 million of loans and accrued interest"); Defs.' Ex. 1625 at 4 (reflecting "[f]orgiveness of notes and interest by GTCR" of $13.710 million); Defs.' Ex. 0591–0594.

**88.** Trial Tr. vol. 092614, 168:21–23; Trial Tr. vol. 093014, 127:8–11; Defs.' Ex. 0589 at

GECC0313739–740 (describing source and uses for GTCR).

**89.** Trial Tr. vol. 092614, 171:25–172:1; Defs.' Ex. 0601; Defs.' Ex. 0588 at GECC0313735 (specifying sources and uses for THI Holdings).

**90.** Defs.' Ex. 0588 at GECC0313736–37 (describing sources of restructuring proceeds to THI).

**91.** Trial Tr. vol. 092614, 211:16–22; Defs.' Ex. 0021.

**92.** Trial Tr. vol. 092614, 32:18–22.; Defs.' Ex. 0564.

is obvious given the otherwise unrebutted evidence concerning THMI's financial performance and profitability.

For starters, THMI did not, and was not intended to, generate profits from management services provided to its affiliated nursing home operators. Rather, as Jannotta credibly testified, THMI was a cost-center for the overhead required to manage the THI and THI–Baltimore facility portfolios.[93] In his words, the THI board of directors ascribed no value to THMI because "it was a money-losing cost center." [94]

As of the closing date, THMI's contracts to manage the third-party nursing homes, Lyric and Claremont, had been terminated. For the calendar year 2005, THI's financial results reflected a net operating loss of $2,601,000, exclusive of one-time nonrecurring restructuring charges. In other words, THMI had no net operating income to which a multiplier could be applied to produce a positive valuation.

In terms of THMI's balance sheet value, the same was true. As reflected in THMI's schedule of assets at the time, THMI had a book value of $430,540.[95] But the largest asset listed on the schedule of assets is prepaid expenses in the amount of $271,251. Prepaid expenses are a current asset that have a useful value of no more than one year and, in any event, would not be an asset that can be monetized in an amount equal to the cost incurred in obtaining the prepaid expense items.

The other major asset was computer equipment valued at cost net of depreciation in the amount of $159,280. While there was no independent appraisal or testimony about what this computer equipment was worth, the Court takes judicial notice based on hundreds of cases in which this Court has observed that computer equipment has virtually no value soon after being purchased because it depreciates technologically within a year or two of its acquisition. In the bankruptcy world, a used computer has little value for anything other than serving as a boat anchor.

Beyond these relatively worthless assets, THMI never owned the furniture, fixtures, or other equipment located at the Sparks, Maryland, office space. It was not even a party to any lease agreement for the space. Further, THMI did not hold any management services or similar contracts with any party as of the closing date and did not have any licenses to operate any healthcare facilities.

THI–Baltimore, on the other hand, did have numerous subsidiaries with leased nursing home facilities. The Plaintiffs' expert, Dr. Vasquez, testified that the equity value of THI Baltimore and THI Nevada was $75,372,000. Ultimately, however, his expert report is flawed in several material respects. First, he used an overstated annualized earnings before interest, taxes, depreciation, and amortization ("EBITDA") number. Second, he double counted the THI Nevada EBITDA. Third, he used an incorrect multiplier. Correcting for these mistakes and otherwise using his methodology yields a value of $36,267,000. That leaves one remaining error in his approach: his failure to take into account the fact that the lease restrictions prevented THI–Baltimore and THI Nevada from being sold to any other entity other than Briarwood. This is significant because it prevented these entities from being exposed to the marketplace.

---

93. Trial Tr. vol. 092614, 128.

94. Trial Tr. vol. 092614, 124:10–16.

95. Defs.' Ex. 1564.

On the other hand, the valuation testimony of Christopher James, GTCR's expert, was far more credible and consistent with the circumstances. He found that these entities had little equity value given the circumstances. The Court agrees with this. After all, as of 2005, THI–Baltimore was nearly insolvent and, by the company auditor's notation to the 2004 financial statements, there was a substantial doubt about the company's ability to continue as a going concern.

Moreover, Jannotta and the THI and THMI boards did not have the luxury of marketing THI to any entity other than Abe Briarwood because of the restrictions in the lease agreements. So Jannotta was left to cut the best deal he could that would generate the most cash that he could get to be used as part of the restructuring. Remember, any shortfall in the cash obtained from the sale of THI–Baltimore had to be covered by GTCR. Obviously, Jannotta was motivated to get the most he could for the THI–Baltimore nursing homes. But because THI–Baltimore's existence was dependent upon its lease agreements with Briarwood and because it had no assets other than its leaseholds under the Briarwood leases, the sale to Briarwood was the only feasible approach to the restructuring.

### Did Jannotta Intentionally Defraud Creditors by Selling for Less Than Fair Value?

The proposition that Jannotta and the board were disposing of the THI–Baltimore nursing homes for less than fair value to defraud creditors defies logic. Why would Jannotta and GTCR want to sell substantial assets to an Abe Briarwood-related entity for less than fair consideration? There is certainly nothing about the relationship between Abe Briarwood and Jannotta that would support a finding of fraudulent intent. This Court's observation was that there was frankly no love lost between the Abe Briarwood principals—Foreman and Grunstein—and Jannotta. Jannotta appeared to the Court to be a very astute businessperson who recognized his duties as a fiduciary and attempted to get the best outcome for all concerned. And he was fully aware that any shortage in the amount received from the sale of the THI–Baltimore nursing homes would come dollar-for-dollar from GTCR.

In this respect, the GTCR Entities and Holdings' economic interests were aligned regarding the sale of THI–Baltimore and THI Nevada stock.[96] There is no evidence that it would have been in the GTCR Entities' interest for THI Holdings to sell THI–Baltimore and THI Nevada stock for less than it was worth.[97]

### Restructuring Closes (March 26, 2006)

Finally, the transaction closed on March 26, 2006. From Jannotta's perspective, the closing appears to have been uneventful. Consistent with the Stock Purchase Agreement requirements, THMI had continued as a going concern through closing. Prior to closing, there was no transfer of THMI employees or assets to other entities. Specifically, as agreed to by THI under the Stock Purchase Agreement, THMI carried on "its business in the usual, regular, and ordinary course in all material respects," THMI's "ongoing business" was not affected, and no distribution of assets or transfer of employees occurred

**96.** Trial Tr. vol. 093014, 46:2–17, 57:13–17.

**97.** *See* Trial Tr. vol. 093014, 56:8–24 (stating that it made no economic sense for GTCR to put in additional moneys to restructure THI and at the same time sell THI–Baltimore for less than its fair value, when the intent of the restructuring is to get additional funds to THI).

during the time in which THMI was owned by THI.[98] Contemporaneously with the closing, Jannotta resigned from his positions as a director of THMI and THI–Baltimore.[99]

### The Aftermath

Following the closing, THMI employees, including all senior management, transitioned to a newly acquired FLTCH affiliate, THI of Baltimore Management, LLC, which later became Fundamental Administrative Services and Fundamental Clinical Consulting. Despite the major restructuring and infusion of capital, payment to creditors, and downsizing of operations, THI once again ran into financial problems, and THI's nursing home assets were sold for $48 million to a company named Omega.[100] On January 7, 2009, THI and its subsidiaries filed for receivership. Included among the authority and responsibility of the Receiver was the management of ongoing litigation to which THI or its affiliates were a party.[101]

### Conclusions of Law

This Court must now decide whether the foregoing facts give rise to liability for breach of fiduciary duty against Jannotta and aiding and abetting a breach of fiduciary duty against GTCR and THI Holdings. For the reasons set forth below, the Court concludes that Plaintiffs failed to meet their burden of proof on their claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty.

### Breach of Fiduciary Duty

■ The Delaware business judgment rule "presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.' "[102] As such, the business judgment rule protects board members who act on an informed basis, in good faith, and in the best interests of the company. It is not appropriate for courts to second-guess the exercise of business judgment by directors.[103]

■ The proposition that Jannotta and GTCR were involved in a breach of fiduciary duty or some sort of self-dealing in which they favored their own interests over the interests of the creditors is completely unsupported by the evidence. To the contrary, at all times Jannotta went to great lengths to remain fully informed, seek input from professionals regarding restructuring, consider all of the available options, and exercise his duties as a member of the board for the ultimate good of the company's creditors.

In particular, Jannotta and the board observed corporate formalities and conducted numerous formal and informal meetings of the various board members to deal with the company's financial problems. In addition, Jannotta and the board consulted extensively with management and brought in outside expertise to analyze the available alternatives. After substantial discussions and consultation with experts, it became apparent there only two potential alternatives in dealing with the financial problems: filing a Chapter 11 or

---

98. Trial Tr. vol. 092614, 162:5–10.

99. Trial Tr. vol. 092614, 200:23–25; Defs.' Ex. 0262; Defs.' Ex. 0265; Defs.' Ex. 0597 at KE_0001272.

100. Trial Tr. vol. 092914, 128:2–7; Trial Tr. vol. 092614, 201:11–13, 201:18–25; Defs.' Ex. 0613 at GTCR–6159, GTCR–6160.

101. Defs.' Ex. 0618 at GECC0339331.

102. *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 52 (Del.2006) (citation omitted).

103. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993).

restructuring the company. And of those two choices, bankruptcy was a far worse alternative because the proposed restructuring at least presented what was viewed at the time as a reasonable probability of a successful turnaround, while bankruptcy, on the other hand, would have only provided cents on the dollars to unsecured creditors.

Critically, there is absolutely no evidence to support the allegation that Jannotta was giving away valuable assets for less than fair consideration. In fact, the argument that he was completely overlooks the fact that there was no other alternative than to sell THI–Baltimore to Abe Briarwood given that the leases contained onerous default and consent provisions effectively mandating the sale to Abe Briarwood. Nor is there any evidence that Jannotta knew FLTCI was a shell company owned by Saacks that would never do business. Jannotta did not know Saacks. And he certainly did not know that it was Forman's intent following the closing to immediately strip out all of THMI's assets and personnel and move them into Fundamental companies that did not assume THMI's liabilities. It was apparent from all the evidence that Jannotta understood that the sale of THMI would not affect THMI's creditors. Rather, it was a stock sale under which the equity owner would change but would leave intact THMI's assets and liabilities.[104] Accordingly, the Court concludes that the Plaintiffs have failed to meet their burden of proof with respect to this count and enters judgment in favor of Jannotta and GTCR.

### Aiding and Abetting a Breach of Fiduciary Duty

Plaintiffs' fiduciary-breach and aiding-and-abetting claims also fail for the separate and independent reason that the evidentiary record shows that the challenged transactions were "entirely fair."[105] Finally, Plaintiffs' claims fail for the additional reason that Plaintiffs have failed to prove that they sustained injury and damages as a result of the alleged breaches.[106]

■ The sum and substance of Plaintiffs' aiding-and-abetting evidence is that GTCR contributed funds to a restructuring that Plaintiffs claim breached fiduciary duties.[107] But, on an aiding-and-abetting claim, the plaintiff must prove that each defendant "knowingly participated not just in the transactions but in the breach of fiduciary duties."[108] To prove this, the plaintiff must establish that a defendant "act[ed] with the knowledge that the conduct advocated or assisted constitutes such a breach."[109]

■ The Plaintiffs fail to satisfy these requirements. To start, GTCR and THI Holdings are entitled to judgment in their favor because there was no fiduciary breach by the members of THMI and THI's boards.[110] Moreover, Plaintiffs' aiding-and-abetting claims fail because Jannotta acted diligently and in good faith,

---

104. Trial Tr. vol. 092614, 189:23–190:6, 190:13–15; Defs.' Ex. 0569.0001.

105. *Id.* at 363–64, 371.

106. *See Taita Chem. Co. v. Westlake Styrene, LP*, 351 F.3d 663, 670–71 (5th Cir.2003) (applying Delaware fiduciary-breach law and overturning jury verdict where plaintiffs failed to prove harm to plaintiffs).

107. *See, e.g.,* Pls.' Compl. ¶¶ 388–92.

108. *In re Radnor Holdings Corp.*, 353 B.R. 820, 844 (Bankr.D.Del.2006).

109. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del.2001).

110. *See Raul v. Rynd*, 929 F.Supp.2d 333, 348 (D.Del.2013) (stating that a "breach of fiduciary duty must exist before a non-fiduciary can aid and abet in such breach").

considering interests of secured and unsecured creditors. The Court finds that Jannotta understood that the restructuring would benefit THI and its secured and unsecured creditors over the bankruptcy alternative. And Jannotta's memoranda to the GTCR Investment Committee evidenced to those decision makers that he was diligent in thinking through the implications of a restructuring.

## Conclusion

It is hard for this Court to imagine what else Jannotta could have done to discharge his fiduciary duties to THI's creditors. He met extensively with the board to discuss THI's precarious financial position and consulted with an expert regarding whether filing for bankruptcy or restructuring out of court—the only potential solutions to THI's financial problems—produced a better outcome for the company's (secured and unsecured) creditors. When the analysis by the expert reflected that a chapter 11 filing—which had uncertain prospects of success—would have only resulted in a 1–2% distribution to unsecured creditors, at best, Jannotta advised GTCR to invest $20 million of new capital into a restructuring that saw THMI sold as part of a transaction that should have left THMI's tort claims unaffected. Jannotta cannot be charged with breaching his fiduciary duty to THI's creditors simply because he was unaware of a secret plan to divest THMI of its assets after the company was sold to FLTCH, and because there was no breach of fiduciary duty, GTCR and THI Holdings cannot be held liable for aiding and abetting a breach of fiduciary duty. Accordingly, the Court will enter a separate judgment in favor of Jannotta, GTCR, and THI Holdings.